Kyle J. Tisdel
Allyson A. Beasley
Rose E. Rushing
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571
(p) 575.224.6260
tisdel@westernlaw.org
beasley@westernlaw.org
rushing@westernlaw.org

*Counsel for Plaintiffs*

Samantha Ruscavage-Barz
WILDEARTH GUARDIANS
301 N. Guadalupe Street, Suite 201
Santa Fe, New Mexico 87501
(p) 505.401.4180
sruscavagebarz@wildearthguardians.org

*Counsel for Plaintiff WildEarth Guardians*

David R. Baake
BAAKE LAW, LLC
350 El Molino Blvd
Las Cruces, NM 88005
(p) 575.343.2782
david@baakelaw.com

*Counsel for Plaintiff Sierra Club*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT, SAN JUAN CITIZENS ALLIANCE, WILDEARTH GUARDIANS, and SIERRA CLUB, | ) ) ) ) | Case No. |
| Plaintiffs, | ) ) ) | **PETITION FOR REVIEW OF AGENCY ACTION** |
| v. | ) ) | |
| UNITED STATES BUREAU OF LAND MANAGEMENT, DEBRA HAALAND, in her official capacity as United States Secretary of the Interior, MELANIE BARNES, in her official capacity as Acting New Mexico State Director of the U.S. Bureau of Land Management, and SHEILA MALLORY, in her official capacity as New Mexico Deputy State Director for Minerals of the U.S. Bureau of Land Management, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Federal Defendants. | ) ) | |

## INTRODUCTION

1.      Plaintiffs Diné Citizens Against Ruining Our Environment, San Juan Citizens

Alliance, WildEarth Guardians, and the Sierra Club (collectively "Community Groups") hereby

bring this civil action for declaratory and injunctive relief against the United States Bureau of

Land Management ("BLM"), and Debra Haaland, Melanie Barnes, and Sheila Mallory in their

official capacities (collectively "Federal Defendants" or "BLM") for:

    a)  BLM's decisions to re-affirm the Trump Administration's flawed authorization and

        issuance of oil and gas leases on 42 parcels, covering nearly 45,000 acres of land

        administered by the BLM's Rio Puerco Field Office ("RPFO"), and Farmington

        Field Office ("FFO"); and

b)  BLM's approval of approximately 120 Applications for Permit to Drill (APDs) on 8 of these lease parcels.

Community Groups bring this action for declaratory and injunctive relief in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.,* for violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.,* and its implementing regulations, and violations of the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and its implementing regulations. The specific final agency actions challenged herein are listed in Appendix A and Appendix B to this Petition for Review.

2.      Federal Defendants' actions, if maintained, will inflict substantial harm to the people and communities, environment, cultural sites, and sacred spaces of the Greater Chaco landscape,[1] including the sacred Sisnaateel Mesa Complex that is central to Diné cosmology. The Sisnaateel Mesa Complex is a 20-mile sacred area, and within those lands, there are particular places that hold even greater importance and a heightened level of sacredness to Diné peoples. The story of these lands, as publicly available, is about the Diné story of the creation of the horse, and is part of the Diné National Epic of "two-sons-that-went-to-their-father." These stories are central to Diné national identity. The physical destruction or impairment of these lands will result in irreparable damage to Diné culture and history.

3.      The present case is the latest example of Federal Defendants continuing to approve, and re-approve, oil and gas lease sales, drilling permits, and related development despite known risks and impacts to health, climate, sacred lands and cultural sites, and

---

[1] Community Groups use the term "Greater Chaco Landscape" to denote the area encompassing all of the known material manifestations of the "Chaco Phenomenon" including Chaco Culture National Historical Park, Chacoan Outliers, Chaco Cultural Archaeological Protection Sites, and the prehistoric Great North Road.

environmental justice. In re-approving the leasing decisions and approving the drilling permits challenged here, BLM failed to take a hard look at potentially significant impacts of its decisions, and in particular failed to consider important aspects of the problem and failed to articulate a rational connection between the facts found and the choices made. Moreover, the agency is in the midst of multiple planning processes for the region, including pending management plans for the Farmington and Rio Puerco field offices, as well as the Department of the Interior's initiation of the "Honoring Chaco Initiative." Each of these planning processes, either alone or in combination, have the potential to change the management of oil and gas resources in the region.

4.     This case challenges Federal Defendants' arbitrary decisions to re-affirm *prior* flawed leasing authorizations following the completion of new environmental assessments ("EAs") for those decisions. Community Groups challenged BLM's original EAs and decisions to issue the 42 lease parcels sold in December 2018, November 2019, and February 2020 (collectively referred to as "2022 Leasing EAs"), in *Diné Citizens Against Ruining Our Environment, et al. v. Bureau of Land Mgmt., et al.*, Case No. 1:20-cv-00673 KG-JHR [Hereinafter "*Diné CARE I*"].

5.     Pursuant to an April 2022 Settlement Agreement in *Diné CARE I*, BLM agreed to prepare new NEPA analyses and issued new EAs and decisions for the lease sales challenged in that case. However, while the remand process provided BLM the opportunity to update and modify its analyses of the challenged leases, in the new analyses BLM still fails to take the hard look that NEPA demands and ignores its substantive duty under FLPMA to take action necessary to avoid unnecessary and undue degradation.

6.     During the pendency of *Diné CARE I*, BLM approved approximately 120 APDs

on the leases. In its Ford EA for those APD approvals, BLM expressly tiered to the leasing

decisions challenged in *Diné CARE I*.  However, in the 2022 Leasing EAs and decisions

challenged here, BLM did not re-visit its NEPA analyses or decisions for the APD approvals on

the leases.

7.      On or about September 2, 2022, BLM sent a letter to Counsel for Plaintiffs

describing its intent to conduct supplemental NEPA analysis on the APDs. However, BLM has

not publicly announced this supplemental NEPA process on ePlanning, or otherwise indicated

that the process is underway and open for participation, or when it will be complete. Thus, the

APD approvals on the leases, and the original NEPA documents for those approvals, are the only

final agency actions on the APDs to-date. Moreover, the leasing stage is the stage of oil and gas

development at which irreversible and irretrievable commitment of resources takes place. BLM

has not, to Plaintiffs' knowledge, suspended or revoked the Ford Project APD approvals pending

new analysis, nor has BLM suspended any other potential, future APD approvals on the leases.

BLM's 2022 leasing decisions thus confer the right to develop oil and gas on these leases, not

only for the approximately 120 already-approved APDs, but also for any other future

development BLM may approve on the leases. Plaintiffs thus properly challenge both the 2022

leasing decisions, and the APD approvals on the leases which pre-date those leasing decisions, as

final agency actions.

8.      Federal Defendants' approval of the challenged drilling permits, and re-approvals

of flawed leasing decisions, confer the right to expand oil and gas development in and around

Diné communities. The reasonably foreseeable development of the leases and the approved

drilling permits includes hydraulic fracturing (or "fracking")[2] and drilling, and will lead to the emission of air pollutants and greenhouse gases and other impacts that harm human health, the environment, and cultural sites—including, but not limited to, the Sisnaateel Mesa Complex. In affirming its leasing decisions and authorizing the challenged drilling permits, Federal Defendants failed to take a hard look at the serious environmental consequences of these decisions, and failed to articulate a rational connection between the facts found and the choices made.

9.      In affirming the decisions to issue the 42 oil and gas lease parcels, and approving approximately 120 drilling permits on the leases, Federal Defendants: (1) violated NEPA by failing to take a hard look at cumulative greenhouse gas ("GHG") emissions and resulting impacts, at the direct and cumulative health impacts to nearby communities, at environmental justice impacts, and at the indirect and cumulative impacts to cultural sites; and (2) violated FLPMA by failing to take action to avoid unnecessary or undue degradation of public lands.

## JURISDICTION & VENUE

10.      This action arises under NEPA, 42 U.S.C. §§ 4321-4370h, FLPMA, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

11.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because the action raises a federal question. The Court has authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

12.      This action reflects an actual, present, and justiciable controversy between Community Groups and the Federal Defendants within the meaning of the Declaratory Judgment

---

[2] Hydraulic fracturing, or fracking, as used here, refers to a combination of horizontal drilling and multi-stage hydraulic fracturing.

Act, 28 U.S.C. § 2201. Community Groups' interests will be adversely affected and irreparably

injured if Federal Defendants continue to violate NEPA, and FLPMA as alleged herein, and if

they affirmatively implement the decisions challenged herein. These injuries are concrete and

particularized and fairly traceable to Federal Defendants' challenged decisions, providing the

requisite personal stake in the outcome of this controversy necessary for this Court's jurisdiction.

13.     The requested relief would redress the actual, concrete injuries to Community

Groups caused by Federal Defendants' failure to comply with duties mandated by NEPA and its

implementing regulations, and FLPMA and its implementing regulations.

14.     The challenged agency actions are final and subject to judicial review pursuant to

5 U.S.C. §§ 702, 704, & 706.

15.     Community Groups have exhausted any and all available and requested

administrative remedies.

16.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e). This case involves

public lands and environmental interests located in New Mexico. A substantial part of the events

or omissions giving rise to the claims, as well as the underlying decision-making and guidance

with respect to BLM's Oil and Gas Leasing Program and drilling permit approvals, as

disseminated to the agency's field offices, have occurred in this district due to decisions made

here by Federal Defendants.

## PARTIES

17.     Plaintiff DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT (Diné

C.A.R.E.) is an all-Navajo organization comprised of grassroots community members active on

Navajo Nation lands in and around the Four Corners region of Arizona, New Mexico, Colorado,

and Utah. Diné C.A.R.E. advocates for our traditional teachings by protecting and providing a

voice for all life within and beyond the Four Sacred Mountains. We promote regenerative and sustainable uses of natural resources consistent with the Diné philosophy of life. We empower local and traditional people to organize and determine their own destinies, in ways that protect the health of their communities, their long-held subsistence practices and way of life. Diné C.A.R.E. members live and subsist in the areas and landscapes that are directly harmed by oil and gas leasing and development authorized by Defendants. Moreover, Diné C.A.R.E. continues to engage in traditional cultural and spiritual practices on these holy lands, which include cultural sites. Diné teachings indicate that our people first emerged into the Fourth World in the eastern region of Dinétah where many of these lease sales and approved drilling permits are located. Diné C.A.R.E. brings this action on its own behalf and on behalf of its adversely affected members.

18.     Plaintiff SAN JUAN CITIZENS ALLIANCE is a grassroots organization dedicated to social, economic, and environmental justice in the San Juan Basin with approximately 1,000 members. San Juan Citizens Alliance organizes San Juan Basin residents to protect our water and air, our public lands, our rural character, and our unique quality of life while embracing the diversity or our region's people, economy, and ecology. With longstanding efforts to address the impacts of oil and gas development to these interests, San Juan Citizens Alliance is deeply concerned that impacts from the continued sale and development of our public lands for oil and gas leasing and drilling will irreparably harm these landscapes and communities. San Juan Citizens Alliance members use and plan to continue to use lands affected by the challenged actions. San Juan Citizens Alliance brings this action on its own behalf and on behalf of its adversely affected members.

//

19.     Plaintiff WILDEARTH GUARDIANS is a non-profit membership organization based in Santa Fe, New Mexico, with offices throughout the West. Guardians has more than 197,000 members and activists, some of whom live, work, or recreate on public lands on and near the leases and drilling permits challenged herein. Guardians and its members are dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Towards this end, Guardians and its members work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate.

20.     Plaintiff SIERRA CLUB was founded in 1892 and is the nation's oldest grassroots environmental organization, with over 830,000 members nationwide, and over 35,000 members and supporters in its Rio Grande Chapter in New Mexico and West Texas. Sierra Club is dedicated to the protection and preservation of the environment. The Sierra Club's mission is to explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments. The Sierra Club has a New Mexico chapter, known as the Rio Grande chapter. Sierra Club has members that use the Greater Chaco area for recreation such as hiking, climbing, backpacking, camping, fishing and wildlife viewing, as well as for business, scientific, spiritual, aesthetic, and environmental purposes, including areas affected by oil and gas development under these lease sales and drilling permit approvals.

21.     The Community Groups' members and supporters use and enjoy, and intend to continue to use and enjoy, lands affected by the challenged leasing authorizations and drilling permit approvals. Community Groups' members and supporters also use and enjoy, and intend to continue to use and enjoy, lands that are around or within view of lands affected by the challenged leasing authorizations and drilling permit approvals, as well as federal public lands

affected by subsequent lease development. Community Groups' members and supporters use, and intend to continue to use, these lands to enjoy cultural sites, wildlands, wildlife habitat, rivers, streams, and healthy environments frequently and on an ongoing basis long into the future, including in 2022, and in subsequent years. The affected lands within or near the lease sale parcels and drilling permit approvals include very popular and iconic landscapes, including, but certainly not limited to, Chaco Culture National Historical Park and the Greater Chaco Landscape, and the sacred Sisnateel Mesa Complex.

22.     Community Groups' members' use and enjoyment of public lands in and adjacent to the leases and drilling permits challenged herein will be adversely affected and diminished, and irreparably injured, as a result of BLM's leasing decisions and drilling permit approvals. Community Groups' members have not only recreated on public lands that include the lease sale parcels and associated drilling permit approvals and development that are the subject of this lawsuit, but also, they enjoy public lands adjacent to these parcels and to ongoing and future development. The reasonably foreseeable development of these lease parcels and approved drilling permits will industrialize these treasured landscapes; produce visible air pollution that is offensive and harmful to human health, especially for children and those in the lease area already facing multiple environmental and social stressors; add to the cumulative harmful effects of greenhouse gas emissions; and lead to connected development that will further adversely impact nearby public lands and harm the health, aesthetic and recreational interests, cultural practices, and spiritual well-being of the people and communities who visit, use, and depend on these lands and call them home.

23.     These are actual, concrete and particularized injuries caused by Federal Defendants' failure to comply with mandatory duties under NEPA and FLPMA.

24.     Community Groups and their members have a procedural interest in Federal Defendants' full compliance with planning and decision-making processes under NEPA and FLPMA for the decisions, on or about August 1, 2022, to affirm the RPFO December 2018, RPFO November 2019, and RPFO and FFO February 2020 oil and gas lease sales, and Federal Defendants' attendant duty to substantiate their decisions in the record for the lease sales.

25.     Community Groups and their members have a procedural interest in Federal Defendants' full compliance with planning and decision-making processes under NEPA and FLPMA for the December 2020 approval of approximately 120 APDs on the challenged leases, and Federal Defendants' attendant duty to substantiate their decisions in the record for the APD approvals.

26.     Community Groups and their members have a substantive interest in Federal Defendants' full compliance with planning and decision-making processes under FLPMA for the decisions, on or about August 1, 2022, to affirm the RPFO December 2018, RPFO November 2019, and RPFO and FFO February 2020 oil and gas lease sales, and Federal Defendants' attendant duty to substantiate their decisions in the record for the lease sales.

27.     Community Groups and their members have a substantive interest in Federal Defendants' full compliance with planning and decision-making processes under FLPMA for the December 2020 approval of approximately 120 APDs on the challenged leases, and Federal Defendants' attendant duty to substantiate their decisions in the record for the APD approvals.

28.     The aesthetic, recreational, scientific, educational, religious, procedural, and substantive interests of Community Groups and their members have been adversely affected and irreparably injured by the process that led to the Federal Defendants' affirmation of its decisions to lease 42 parcels, and decision to approve approximately 120 APDs, and will be adversely

affected and irreparably injured by Federal Defendants' authorizations of irresponsible development on the leases. These are actual, concrete injuries caused by Federal Defendants' failure to comply with mandatory duties under NEPA and FLPMA. The relief sought would redress the injuries.

29.     Federal Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior and is responsible for managing public lands and resources in New Mexico, including federal onshore oil and gas resources and the leasing program for those resources. In this managerial capacity, BLM is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

30.     Federal Defendant DEBRA HAALAND is sued in her official capacity as the Secretary of the United States Department of the Interior and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

31.     Federal Defendant MELANIE BARNES is sued in her official capacity as Acting State Director for the Bureau of Land Management in New Mexico. She is responsible for managing public lands under BLM authority, including lands and resources in New Mexico subject to the decision at issue herein, in accordance with NEPA and other federal law.

32.     Federal Defendant SHEILA MALLORY is sued in her official capacity as Deputy State Director for Minerals for the Bureau of Land Management in New Mexico. She is responsible for managing public lands under BLM authority in New Mexico, including lands and resources subject to the decision at issue herein, in accordance with NEPA and other federal law, and signed the 2022 BLM leasing decisions challenged here.

## LEGAL BACKGROUND

### I.  National Environmental Policy Act (NEPA)

33.     Recognizing "the profound impact of man's activity on the interrelations of all components of the natural environment," Congress enacted NEPA in 1970 "to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony . . . ." 42 U.S.C. § 4331(a). The act declares that "each person should enjoy a healthful environment"—to ensure that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," among other policies. *Id.* § 4331(b.

34.     According to the White House Council on Environmental Quality ("CEQ"), the federal agency responsible for implementing NEPA:

> . . . NEPA was a statute ahead of its time, and it remains relevant and vital today. It codifies the common-sense and fundamental idea of "look before you leap" to guide agency decision making, particularly in complex and consequential areas, because conducting sound environmental analysis before actions are taken reduces conflict and waste in the long run by avoiding unnecessary harms and uninformed decisions. It establishes a framework for agencies to ground decisions in sound science and recognizes that the public may have important ideas and information on how Federal actions can occur in a manner that reduces potential harms and enhances ecological, social, and economic well-being.

87 Fed. Reg. 23,453 (April 20, 2022).

35.     NEPA achieves its purpose through "action forcing procedures. . . require[ing] that agencies take a *hard look* at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added).

//

36.    Federal agencies must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v).

37.    To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement, known as an Environmental Impact Statement ("EIS"), must among other things ensure that agencies consider the environmental impacts of their actions in decision-making; provide full and fair discussion of significant environmental impacts; and inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment. 40 C.F.R. § 1502.1. An EIS must describe the environment of the area or areas to be affected, including the reasonably foreseeable environmental trends in the areas and the environmental impacts of the proposed action; reasonable alternatives to the proposed action and the significance of those impacts; and the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.15, 1502.16(a)(1)-(9).

38.    BLM's analysis must do more than merely identify impacts; it must also "evaluate the severity" of effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. at 352. An agency may also prepare an environmental assessment ("EA") if it has determined not to prepare an EIS. 40 C.F.R. § 1501.5(a).

39.    An EA must include discussion of sufficient evidence and analysis to determine whether to prepare an EIS or a finding of no significant impact ("FONSI"); the environmental impacts of the proposed action; and alternatives to the proposed action. *Id.* § 1501.5(c).

40.     NEPA requires BLM to consider "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii).

41.     These effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative" effects. 40 C.F.R. § 1508.8.

### A.  Executive Order 12898, Executive Order 14008, and the CEQ Guidance on Environmental Justice in the NEPA Process.

42.     Executive Order 12898 ("EO 12898"), Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, requires that each federal agency "shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations" to the greatest extent practicable. 59 Fed. Reg. 7,629 (Feb. 11, 1994).

43.     Environmental justice, in turn, is defined by the EPA as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income, with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[3] According to the EPA, environmental justice "will be achieved" when "everyone enjoys" two things: "the same degree of protection from environmental and health hazards," and "equal access to the decision-making process to have a healthy environment in which to live, learn, and work."[4]

//

---

[3] *See* EPA, "Environmental Justice," available at:
https://www.epa.gov/environmentaljustice/learn-about-environmental-justice
[4] *Id.*

44.     Environmental justice is a "relevant factor" and an "important aspect of the problem" for which courts have held that federal agencies must take a hard look under NEPA and the APA.

45.     The CEQ has developed guidance to assist federal agencies in addressing environmental justice issues during the NEPA process. CEQ recognizes that "[e]nvironmental justice issues may arise at any step of the NEPA process and agencies should consider these issues at each and every step of the process, as appropriate." CEQ, *Environmental Justice under the National Environmental Policy Act*, at 8 (Dec. 10, 1997).

46.     According to the CEQ Guidance, environmental justice "consideration of impacts on low-income populations, minority populations, or Indian tribes", can identify and illuminate disproportionately high and adverse effects that are "significant" under NEPA, but that would otherwise be overlooked. *Id.* at 10.

47.     The CEQ Guidance directs agencies to ensure meaningful community involvement in the NEPA process, recommending that "[a]gencies should be aware of the diverse constituencies within any particular community when they seek community representation and should endeavor to have complete representation of the community as a whole. Agencies also should be aware that community participation must occur as early as possible if it is to be meaningful." *Id.* at 9.

48.     On his first day in office, President Biden signed Executive order 13990 ("EO 13990"), Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7037 (Jan. 20, 2021). Through EO 13990, the President directed all executive departments and agencies "to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other

actions" during the Trump administration that conflict with environmental justice, climate, and public health objectives outlined in the EO, and "to immediately commence work to confront the climate crisis."

49.    One week later, President Biden affirmed his administration's commitment to tackling climate change, and to ensuring that environmental justice concerns were front and center in undertaking this "urgent and necessary" work, by issuing Executive Order 14008 ("EO 14008"), Tackling the Climate Crisis at Home and Abroad. 86 Fed. Reg. 7619 (Jan. 27, 2021).

50.    Through EO 14008, the President directed that federal "[a]gencies shall make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities…" *Id.* at 7629.

## II.    Federal Land Policy and Management Act (FLPMA)

51.    The property clause of the United States Constitution confers upon Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONSTITUTION, ART. IV., SEC. 3, CL. 2. Congress has exercised its power over federal public lands through the passage of FLPMA. "[W]hile the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, [the U.S. Supreme Court] ha[s] repeatedly observed that '(t)he power over the public land thus entrusted to Congress is without limitations.'" *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (citations omitted).

52.    The Federal Land Policy and Management Act ("FLPMA") requires that "[t]he Secretary [of the Interior] shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which

provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a). Accordingly,

BLM must create resource management plans ("RMPs") pursuant to FLPMA's resource

management planning regulations. 43 C.F.R. § 1610.

54.   FLPMA directs that "the public lands be managed in a manner that will protect

the quality of [critical resource] values; that, where appropriate, will preserve and protect certain

public lands in their natural condition; that will provide food and habitat for fish and wildlife

and domestic animals; and that will provide for outdoor recreation and human occupancy and

use." 43 U.S.C. § 1701(a)(8). The act requires the Secretary to account for "the long-term needs

of future generations." *Id.* at § 1702(c). This substantive mandate requires that the Secretary not

elevate the development of oil and gas resources above other critical resource values in a

planning area. To the contrary, FLPMA requires that where oil and gas development would

threaten the quality of critical resources, conservation of these resources should be the

preeminent goal.

54.   FLPMA also provides that public lands be managed "on the basis of multiple use

and sustained yield." *Id.* § 1701(a)(7).

55.   The term "multiple use" means:

. . . a combination of balanced and diverse resource uses that takes into account
the long-term needs of future generations for renewable and nonrenewable
resources, including, but not limited to, recreation, range, timber, minerals,
watershed, wildlife and fish, and natural scenic, scientific and historical values;
and harmonious and coordinated management of the various resources without
permanent impairment of the productivity of the land and the quality of the
environment with consideration being given to the relative values of the resources
and not necessarily to the combination of uses that will give the greatest economic
return or the greatest unit output.

*Id.* § 1702(c).

//

56.     The term "sustained yield" means "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." *Id.* § 1702(h).

57.     In applying the principles of multiple use and sustained yield mandated by FLPMA, "the Secretary shall, by regulation or otherwise, take any action necessary *to prevent unnecessary or undue degradation of the lands*." *Id.* § 1732(b) (emphasis added). This duty is "the heart of FLPMA." *Mineral Policy Center v. Norton*, 292 F. Supp.2d 30, 42. (D.D.C. 2003).

58.     FLPMA expressly obliges Interior to "issue regulations necessary to implement the provisions of [FLPMA] with respect to the management, use, and protection of the public lands …" 43 U.S.C. § 1733(a).

## III.    Legal Framework for Federal Oil and Gas Leasing and Drilling Permit Authorizations

### A.    Mineral Leasing Act

59.     Under the Mineral Leasing Act ("MLA"), as amended, the Secretary of the Interior is responsible for managing and overseeing mineral development on public lands, not only to ensure safe and fair development of the mineral resource, but also to "safeguard[]…the public welfare." 30 U.S.C. § 187.

60.     The Secretary has certain discretion, constrained by the laws at issue in this case, to determine where, when, and under what terms and conditions mineral development should occur. 43 C.F.R. § 3101.1-2.

61.     The MLA regulations provide: "Each proper BLM State office shall hold sales at least quarterly if lands are available for competitive leasing" and "[l]ease sales shall be conducted by a competitive oral bidding process." 43 C.F.R. § 3120.1-2.

62.     Not all of the parcels offered for sale in any given BLM lease sale are awarded through competitive bidding. Parcels offered but not sold at auction are made available for private sale for two years after the competitive lease sale. 30 U.S.C. § 226(b)(1)(A).

63.     BLM's MLA regulations also state that "[t]he authorized officer may suspend the offering of a specific parcel while considering a protest or appeal against its inclusion in a Notice of Competitive Lease Sale." 43 C.F.R. § 3120.1-3.

**B.     BLM's Oil and Gas Planning and Management**

64.     BLM manages onshore oil and gas development through a three-phase process. Each phase is distinct, serves distinct purposes, and is subject to distinct rules, policies, and procedures.

65.     In the first phase, BLM prepares a Resource Management Plan ("RMP") in accordance with 43 C.F.R. §§ 1600 *et seq*., along with additional guidance found in BLM's Land Use Planning Handbook (H-1601-1) (hereafter, "BLM Handbook"). An RMP projects present and future use of public lands and their resources by establishing management priorities, as well as guiding and constraining BLM's implementation-stage management. With respect to fluid minerals leasing decisions, the RMP determines which lands containing federal minerals will be open to leasing and under what conditions. BLM's determinations are to be based on a hard look analysis of the direct, indirect, and cumulative impacts to the human environment of predicted implementation-stage development in the RMP's corresponding EIS.

66.     Along with the RMP, BLM generally develops a reasonably foreseeable development scenario ("RFDS") outlining the projected pace and scope of oil and gas development within the RMP planning area. An RFDS does not include any analysis of environmental impacts and is not a NEPA document.

67.     In the second phase, oil and gas companies typically nominate leaseholds for sale through the submission of an "Expression of Interest." *See* 43 C.F.R. § 3120.1-1 (providing that "lands included in any expression of interest…shall be offered for competitive bidding"). BLM then assesses whether these lands are available, identifies the boundaries for lands to be offered for lease, and proceeds to offer up those lands through a lease sale. Leases are sold in accordance with 43 C.F.R. §§ 3120 *et seq*., and agency guidance. The BLM state office generally oversees the lease sale, while the BLM field office where the specific lease parcels are located conducts NEPA review, solicits public comment, and applies appropriate site-specific leasing stipulations.

68.     BLM regulations allow for the public to protest the sale of specific parcels. 43 C.F.R. § 3120.1-3. Although BLM may proceed with a lease sale after a protest has been filed, BLM must resolve any and all protests received prior to issuing a lease parcel to a successful bidder. BLM Competitive Leases Handbook H-3120-1, Section II.G. ("Every effort must be made to decide the protest prior to the sale.").

69.     NEPA regulations mandate that agencies "shall to the fullest extent possible . . . [e]ncourage and facilitate public involvement in the decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2 (d). Agencies, including BLM, are required to involve the public in preparing EAs "to the extent practicable." 40 C.F.R. §1501.4(b). BLM regulations also require public participation during oil and gas lease sales. *See* 40 C.F.R. § 3120.1-3 (requiring a protest period), § 3120.4-1 (requiring notice of a competitive lease sale).

70.     Prior to the point BLM sells a lease, BLM may refuse to lease public lands, even if public lands were made available for leasing pursuant to the RMP. BLM also has the authority to subject leases to terms and conditions, which can serve as "stipulations" to protect the environment. 43 C.F.R. § 3101.1-3. Once BLM issues leases, it may only impose conditions of

approval ("COAs") that are delimited by the terms and conditions of the lease. *Id*. § 3101.1-2. A lease stipulation is therefore legally and functionally different than a COA, as those terms are used by BLM.

71.     Once the lease is sold, the lease purchaser has the right to use as much of the leased land as is necessary to explore and drill oil and gas within the lease boundaries, subject to stipulations attached to the lease and compliance with the law. 43 C.F.R. § 3101.1-2

72.     The Secretary of the Interior has the authority to cancel leases that have been "improperly issued." 43 C.F.R. § 3108.3(d). A lease may be canceled where, for example, BLM has not complied with NEPA prior to lease issuance.

73.     The third phase occurs once BLM issues a lease. In order to develop the minerals, the lessee is required to submit an application for permit to drill ("APD") to BLM prior to drilling. 43 C.F.R. § 3162.3-1(c). At this stage, BLM may condition the approval of the APD on the lessees' adoption of "reasonable measures" whose scope is delimited by the lease and the lessees' surface use rights. 43 C.F.R. § 3101.1-2.

74.     NEPA allows BLM to tier oil and gas decision-making at the APD phase to analysis covered in a broader RMP/EIS. 40 C.F.R. § 1508.28. Where specific issues in subsequent oil and gas decision-making process are not covered in the RMP/EIS, the agency cannot tier to the RMP/EIS. In that case, a site-specific NEPA analysis must be prepared which includes analysis of relevant impacts.

75.     Oil and gas operations must be conducted in accordance with BLM regulations at 43 C.F.R. §§ 3160 *et seq*.

//

## IV.    Administrative Procedure Act

76.    The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

77.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court must also compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

## FACTUAL BACKGROUND

## I.    *Diné CARE v. BLM I* Leasing Challenge and Settlement

78.    Community Groups filed their original Petition for Review of Agency Action in *Diné CARE I* on July 9, 2020, challenging BLM's sale of 30 oil and gas leases pursuant to the December 2018 RPFO lease sale and alleging violations of NEPA, 42 U.S.C. §§ 4321 *et seq.,* and its implementing regulations, made reviewable pursuant to the APA, 5 U.S.C. § 701 *et seq.,* and violations of the public participation provisions of FLPMA, 43 U.S.C. § 1701 *et seq*. On January 19, 2021, Community Groups filed a Supplemental Petition, adding challenges to the November 2019 and February 2020 lease sales after BLM denied Community Groups' protests of those lease sales in December 2020.

79.    In total, *Diné CARE I* challenged BLM's *initial* authorization of oil and gas leases on 42 parcels, administered by BLM's RPFO in its December 2018, November 2019, and February 2020 lease sales, as well as BLM's FFO in its February 2020 lease sale. Together, the parcels cover nearly 45,000 acres in the Greater Chaco. BLM agreed to conduct new NEPA analyses and re-visit its decisions for those lease sales in 2022, pursuant to a settlement

agreement in *Dine Care I.* Following that new analysis, BLM affirmed its decisions to authorize and issue all of the challenged leases.

80.     In the present case, Community Groups challenge BLM's decisions to *re-approve* all of these lease sales, covering all 42 parcels and nearly 45,000 acres challenged in *Diné CARE I*, for, among other things, the agency's failure to take NEPA's requisite hard look at environmental and health impacts in the 2022 Leasing EAs.

81.     In *Diné CARE I*, Community Groups, Federal Defendants, and Intervenor-Defendants EOG Resources, Inc. (together, "the Parties") engaged in settlement discussions from August to November, 2021. During that time, Community Groups learned that BLM had already approved approximately 120 APDs on 8 of the challenged lease parcels, and that road construction—including grading and vegetation removal—to provide access for well construction and drilling on the challenged leases had already begun and was ongoing.

82.     Parties did not come to a resolution, and Community Groups filed an Opening Brief in *Diné CARE I* on November 23, 2021.

83.     On December 21, 2021, instead of filing a Response Brief on the merits in *Diné CARE I*, Federal Defendants filed a Motion for Voluntary Remand Without Vacatur, acknowledging flaws in the original analyses for the challenged leasing decisions. On January 18, 2022, Community Groups filed a Response in Opposition to Defendants' Motion for Voluntary Remand Without Vacatur. Community Groups did not oppose voluntary remand but did oppose remand without vacatur.

84.     On January 19, 2022, Community Groups also filed a Motion for Preliminary Injunction to attempt to halt further drilling, permit approvals, associated development, and other ground-disturbing activities on the challenged leases.

85.     Shortly after Community Groups filed their Motion for Preliminary Injunction in *Diné CARE I*, the Parties resumed settlement negotiations, and on January 25, 2022, the Parties jointly moved to stay the proceedings to continue good-faith settlement negotiations.

86.     On or about April 5, 2022, the Parties in *Diné CARE I* entered into a Settlement Agreement whereby, among other terms, BLM agreed to prepare supplemental NEPA analyses for the challenged leases, to be completed by August 1, 2022, and EOG agreed not to proceed with the development of undrilled but approved APDs during the pendency of the remand.

87.     On or about June 13, 2022, BLM issued new Draft Environmental Assessments ("EAs") and unsigned Findings of No Significant Impacts ("FONSIs") for the RPFO December 2018, November 2019, and February 2020 lease sales and the FFO February 2020 lease sale.

88.     On July 13, 2022, Community Groups timely submitted comments on the Draft EAs and unsigned FONSIs via ePlanning.

89.     On or about August 1, 2022 BLM issued Final EAs, Decision Records, and Signed FONSIs for each of the challenged lease sales, affirming its decisions to lease all 42 parcels from the December 2018, November 2019, and February 2020 lease sales.

90.     On or about August 1, 2022, pursuant to the Settlement Agreement reached in *Diné CARE I*, EOG Resources, Inc. was allowed to resume development of the challenged APDs and otherwise resume development on the leases.

91.     On or about August 11, 2022, pursuant to the Settlement Agreement, the Parties in *Diné CARE I* filed a Stipulation of Dismissal and the case was dismissed with prejudice.

92.     On October 11, 2022, BLM filed re-issued decisions for its July 31, 2022 decisions to affirm the February 2020 and December 2018 RPFO lease sales. BLM stated in that filing that the decisions are identical to those issued July 31, 2022, but BLM re-issued them

pursuant to a September 30, 2022 decision by the Interior Board of Land Appeals ("IBLA") in an appeal filed by a third party on these lease sales. BLM filed notice of these re-issued decisions with the court in *Diné CARE I*.

## II.     The Ford EA and BLM's APD Approvals on the Challenged Leases

93.     On or about October 9, 2020, BLM posted a Draft EA (Draft "Ford EA") to "analyze and disclose the environmental consequences of development of 14 oil and gas wellpad projects" encompassing, among other things, approximately 120 APDs ("Ford Project APDs) on 8 of the challenged lease parcels.

94.     BLM stated that its Ford EA "tiers to and incorporates by reference the information and analysis contained in the RPFO December 2018 Competitive Oil and Gas Lease Sale EA and subsequent addendum"—the exact NEPA analyses challenged in then-ongoing litigation in *Diné CARE I*, and with which BLM later acknowledged it had "substantial concerns" regarding the legal sufficiency of that analysis.

95.     On December 17, 2020, BLM posted a Final Ford EA, Decision Record, and FONSI to ePlanning and approved, among other things, approximately 120 APDs on 8 of the challenged lease parcels.[5] BLM did not notify Community Groups of this decision, despite its direct relevance to ongoing leasing litigation.

96.     As stated above, on or about September 2, 2022, BLM sent a letter to Counsel for Plaintiffs describing its intent to undergo supplemental NEPA review for the challenged Ford Project APDs. However, as described above, that supplemental NEPA review has not been publicly announced via ePlanning or otherwise, and BLM has not suspended or modified the

---

[5] The Ford EA, Decision Record, and FONSI are available on ePlanning at
https://eplanning.blm.gov/eplanning-ui/project/2002988/570

existing APD approvals.  Thus, BLM's December 2020 approval of the Ford Project APDs, and approval of an additional Ford Project well via a Determination of NEPA Adequacy (DNA) on August 26, 2022 represents the final agency action on these APDs to-date. Subsequently, BLM's 2022 leasing decisions mean that BLM could approve additional APDs and authorize further development on the leases, even if no further development occurred on the Ford Project APDs.

**III.    Cumulative Greenhouse Gas Emissions and Climate Change Impacts**

**A.       The Climate Crisis**

**97.**    The scientific consensus is clear: as a result of greenhouse gas emissions, our climate is rapidly destabilizing with potentially catastrophic results, including rising seas, more extreme heatwaves, increased drought and flooding, larger and more devastating wildfires and hurricanes, and other destructive changes. It is now conclusively established that GHG emissions from the production and combustion of fossil fuels are the predominant drivers of climate change.

**98.**    According to the Fourth National Climate Assessment, eighty-five percent of U.S. greenhouse gas emissions come from oil, gas, and coal. Carbon dioxide ("$CO_2$") is the leading cause of climate change and the most emitted greenhouse gas in the United States. According to a 2018 EPA report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2016*, carbon dioxide comprised 82% of total U.S. greenhouse gas emissions, or 5.3 billion metric tons. EPA's data indicates that fossil fuel combustion accounted for 93.5% of carbon dioxide emissions within the U.S. in 2016. Although emissions declined at the beginning of the COVID-19 pandemic due primarily to a decrease in travel, they have since rebounded to their highest level in history.

//

99.  Methane ("CH$_4$") is an extremely potent GHG, with a global warming potential 87 times that of CO$_2$ over a 20-year period. Over a 100-year period, methane has a climate impact 28 to 36 times greater than that of CO$_2$ on a ton-for-ton basis. Large amounts of methane are released during the extraction, processing, transportation, and delivery of oil and gas, with significant climate impacts.

100.  Future oil and gas development resulting from the challenged leases and drilling permits has the potential to significantly increase CO$_2$ and methane emissions in the Greater Chaco.

101.  In October 2018, the IPCC issued a special report that examined, in greater depth, the impacts of global warming of 1.5°C above pre-industrial levels as compared to 2.0°C. The IPCC's findings included:

- Human activities are estimated to have caused approximately 1.0°C of global warming above pre-industrial levels, with a likely range of 0.8°C to 1.2°C. Global warming is likely to reach 1.5°C between 2030 and 2052 if it continues to increase at the current rate.

- Warming from anthropogenic emissions from the pre-industrial period to the present will persist for centuries to millennia and will continue to cause further long-term changes in the climate system, such as sea level rise, with associated impacts but these emissions alone are unlikely to cause global warming of 1.5°C.

- Climate-related risks to health, livelihoods, food security, water supply, human security, and economic growth are projected to increase with global warming of 1.5° C and increase further with 2° C. Limiting warming to 1.5° C could reduce the number of people both exposed to climate-related risks and susceptible to poverty by up to several hundred million by 2050 (medium confidence).

  Pathways limiting global warming to 1.5° C with no or limited overshoot would require rapid and far-reaching transitions in energy, land, urban and infrastructure (including transport and buildings), and industrial systems (high confidence). These systems transitions are unprecedented in terms of scale, but not necessarily in terms of speed, and imply deep emissions reductions in all

sectors, a wide portfolio of mitigation options and a significant upscaling of investments in those options (medium confidence).

102.     The western United States and New Mexico especially, is particularly susceptible to the effects of climate change. The West is also experiencing increasing temperatures and prolonged droughts, with widespread impacts across our forests, wildlife, and human communities that threaten resilience in the face of continued warming. Local economies, which rely on consistent precipitation and snowfall for surface and groundwater recharge, agriculture, recreation, and other uses, have also seen significant impacts.

103.     According to the Third and Fourth National Climate Assessments, increased warming, drought, and insect outbreaks, all caused by or linked to climate change, have exacerbated wildfires and impacts to people and ecosystems in the Southwest.

104.     Future projections for the West are even more alarming, particularly in the Southwest, where climate change threatens to lead "to aridification (a potentially permanent change to a drier environment) . . . through increased evapotranspiration, lower soil moisture, reduced snow cover, earlier and slower snowmelt, and changes in the timing and efficiency of snowmelt and runoff." Climate change-related drought has already had massive impacts on food production and the agricultural economy of rural areas in the Southwest, and poses a long-term threat to food security in the region.

105.     In a 2022 report, the IPCC confirmed that climate change is not simply a future threat, but that "[w]idespread, pervasive impacts to ecosystems, people, settlements, and infrastructure" are already being seen globally, and "[t]he rise in weather and climate extremes has led to some irreversible impacts as natural and human systems are pushed beyond their ability to adapt."

//

**106.**     Recently, the IPCC has also recognized climate *justice* as an essential component

of climate analysis and discussion in parts of its Sixth Assessment Report. The report outlines

three main components of climate justice, stating:

> The term climate justice, while used in different ways in different contexts by
> different communities, generally includes three principles: distributive justice
> which refers to the allocation of burdens and benefits among individuals, nations
> and generations; procedural justice which refers to who decides and participates
> in decision-making; and recognition which entails basic respect and robust
> engagement with and fair consideration of diverse cultures and perspectives.

**107.**     These findings have been affirmed by the federal government, and BLM

acknowledges in 2022 leasing EAs and in the Ford EA for the challenged APDs that global

warming is anthropogenic and "primarily attributed to human activities such as fossil fuel

combustion, industrial processes, and land use changes."[6]

### B.     Federal Climate Policy and Initiatives

**108.**     In Executive Order 13514, Federal Leadership in Environmental, Energy, and

Economic Performance (Oct. 5, 2009), President Obama called on all federal agencies to

"measure, report, and reduce their GHG emissions from direct and indirect activities." 74 Fed.

Reg. 52,117 (Oct. 8, 2009). In 2015, President Obama revoked Executive Order 13514 and

issued Executive Order 13693, Planning for Federal Sustainability in the Next Decade (Mar. 25,

2015), which superseded EO 13514 and reaffirmed the federal government's commitment to

reducing GHG emissions. 80 Fed. Reg. 15,871 (Mar. 25, 2015).[7]

**109.**     In 2009, EPA issued a formal finding under the Clean Air Act, 42 U.S.C. §

7521(a), that the changes in our climate caused by elevated concentrations of greenhouse gases

---

[6] *See, e.g.,* Ford EA at 40-41; 2022 leasing EA for RPFO December 2018 at 89, 165.
[7] While President Trump revoked President Obama's Executive Order 13693, President Trump
nonetheless required federal agencies to track and report on GHGs. Executive Order 13834, 83
Fed. Reg. 23,771 (May 17, 2018).

in the atmosphere are reasonably anticipated to endanger the public health and welfare of current and future generations. 74 Fed. Reg. 66,496 (Dec. 15, 2009). EPA concluded that "the body of scientific evidence compellingly supports" the finding and recognized the potential human-induced climate change to have "far-reaching and multidimensional" impacts. *Id*. at 66,497.

110.    The CEQ has recognized the unique nature of climate change and the challenges it imposes on NEPA compliance. As explained above, while the Trump administration rescinded CEQ's 2016 GHG Guidance, the Biden administration directed that federal agencies may use this guidance. The 2016 GHG Guidance, applicable to all proposed federal agency actions, "including land and resource management actions," recognized that:

> Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. *Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA.* Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact.

2016 GHG Guidance at 9, 10-11 (emphasis added).

111.    The 2016 GHG Guidance provides that, "[i]n the context of long-range energy, transportation, and resource management strategies . . . it would be useful and efficient to provide an aggregate analysis of GHG emissions or climate change effects in a programmatic analysis and then incorporate by reference that analysis into future NEPA reviews." *Id.* at 31.

112.    In Executive Order 14008, President Biden acknowledged that:

> The scientific community has made clear that the scale and speed of necessary [to address climate change] is greater than previously believed. There is little time left to avoid setting the world on a dangerous, potentially catastrophic, climate trajectory. Responding to the climate crisis will require both significant short-term global reduction in greenhouse gas emissions and net-zero emission by mid-century or before.

Executive Order 14008, 86 Fed. Reg. 7619, (Feb. 1, 2021).

113.    Later in 2021, the Secretary of the Interior issued Secretarial Order 3399, which instructs "all Bureaus/Offices to utilize science and enhance opportunities for Tribal and environmental justice community engagement in the NEPA and decision-making process." Specifically, it orders agencies to "consider impacts on both the natural or physical environment as well as social, cultural, and economic impacts," and it emphasizes the importance of Tribal consultation.[8]

114.    In October 2021, BLM released a report on the annual greenhouse gas emissions and climate trends associated with federal oil and gas development: 2020 BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends ("BLM Specialist Report"). This report is specifically focused on "estimating GHG emissions from coal, oil, and gas development that is occurring, and is projected to occur, on the federal onshore mineral estate." It includes a summary of current emissions estimates from development and production, as well as "longer term assessments of potential federal fossil fuel GHG emissions and the anticipated climate change impacts resulting from the cumulative global GHG burden," and is being used as "a tool for evaluating the cumulative impacts of GHG emissions from fossil fuel energy leasing and development authorizations on the federal onshore mineral estate."

//

---

[8] Secretarial Order 3399, available at:
https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3399-508_0.pdf.

**115.** The BLM Specialist Report is designed to be updated annually. This report provides both short- and long-term emissions estimates based on projected development, and "serves as a tool to track the evolution of climate science and policy in order to provide decision makers with the best available data to implement management strategies consistent with regulatory requirements." The report contains discussion of carbon budgets and is explicitly intended to be used as a supplement to NEPA analysis at the project or decision level.[9]

**116.** BLM cites to the Specialist Report in its 2022 leasing EAs. The Ford EA for the APD approvals, however, pre-dates the Specialist Report and thus does not cite to or incorporate it.

**117.** In 2019, the D.C. District Court found in *WildEarth Guardians v. Zinke* that BLM must "consider the cumulative impact of GHG emissions generated by past, present, or reasonably foreseeable BLM lease sales in the region and nation." 368 F. Supp. 3d 41, 77 (D.D.C. 2019).

### C. Cumulative GHG Emissions and Impacts of BLM's Fossil Fuel Program

**118.** BLM is responsible for the management of nearly 700 million acres of federal onshore subsurface minerals. Based on 2012 figures, the ultimate downstream GHG emissions from fossil fuel extraction from federal lands and waters by private leaseholders accounts for approximately 21% of total U.S. GHG emissions and 24% of all energy-related GHG emissions.[10]

---

[9] BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends, available at: https://www.blm.gov/sites/blm.gov/files/docs/2021-11/2020%20BLM%20Specialist%20Report%20-%20GHG%20Emissions%20and%20Climate%20Trends%20%2811-3-21%29.pdf.

[10] Stratus Consulting, "Greenhouse Gas Emissions from Fossil Fuel Energy Extracted from Federal Lands and Waters: An Update" at 10 (2014), available at: http://riggingthesystem.org/wp-content/uploads/2017/07/Stratus-Report.pdf.

119.    As of October 2020, BLM-managed lands contained 37,496 individual oil and gas

lease parcels, covering over 26.6 million acres of public lands, on which 96,110 active

producible wells are drilled. The area already leased for oil and gas extraction covers an area

nearly as large as all federal lands combined in the State of New Mexico (27.5 million acres).

120.    BLM's Oil and Gas Leasing Program already contributes vast amounts of GHGs

into the atmosphere, posing a threat to climate, the natural environment, and public health.

According to a 2018 report from the U.S. Geological Survey ("USGS"), fossil fuel development

on federal lands alone in 2014 released 1.279 $GtCO_2$ emissions, or 23.7% of the nation's $CO_2$

emissions.[11] Based on EPA data, this is the equivalent of annual GHG emissions from over 329

coal-fired power plants.

121.    New Mexico in particular was reported to be the source of 6% of all $CO_2$

emissions from federal fossil fuel production, higher than all but one other state. New Mexico

was also found to be the source of 23% of all methane emissions from federal lands, higher than

every state except Wyoming.

122.    In spite of the worsening climate crisis, BLM continues to authorize the sale and

issuance of hundreds of new federal oil and gas leases and subsequently approves thousands of

new APDs on public lands across the Interior West without meaningfully acknowledging or fully

evaluating the climate change implications of its actions.

123.    BLM's new decisions to re-affirm its leasing authorizations and issuances from

the original EAs and Addenda for the RPFO December 2018 lease sale, the RPFO November

2019 lease sale, and the RPFO and FFO February 2020 lease sales will lead to new oil and gas

---

[11] *See* Merrill, M.D. et al., 2018, *Federal lands greenhouse gas emissions and sequestration in
the United States—Estimates for 2005–14: U.S. Geological Survey Scientific Investigations
Report 2018-5131* at 1 (2018).

development on almost 45,000 acres of public lands in a region that is already over 90% leased for oil and gas activity, with over 40,000 wells already drilled in the area.

124.     All four of BLM's 2022 leasing EAs cite to the Mancos-Gallup RFD scenario (Crocker and Glover 2018) projecting 3,200 new oil and gas wells within the San Juan Basin between 2018 and 2037, the majority (2,300) of which are predicted to be horizontally drilled. The 2022 leasing EAs also cite to the "RPFO RFD," (Crocker and Glover 2019), projecting 3,400 instead of 3,200 new oil and gas wells over the next 20 years.

125.     Altogether, based on BLM's projections, the challenged lease sales would result in 42 new wells (including both horizontal and vertical wells), that emit between 232,328 metric tons and 994,820 metric tons of additional $CO_2e$ *each year*.[12]  BLM cannot simply quantify these emissions, whether direct, indirect, or cumulative—it must actually analyze their significance in the context of the global climate crisis.

126.     Based on the Ford EA approving the APDs, under which approximately 120 APDs have been approved on just 8 parcels, well development on the leases could be even higher than what BLM projected in the 2022 leasing EAs.  Yet, while BLM acknowledged these APD approvals in the 2022 leasing EAs, the agency failed to update its projections of GHG emissions (or any other emissions) accordingly.

127.     The Ford EA predicts up to 100,254 metric tons of $CO_2e$ annually from Ford Project well construction and operations (using an estimate of 155 wells/year) and 0.36 *million* metric tons (MMT) $CO_2e$ *per well* from downstream/end-use over a 20-year project period.

//

---

[12] Minimum based on BLM's "average-year" annual direct and indirect emissions projections for the lease sales using 100-year global warming potential (GWP). Maximum based on BLM's "max-year" annual emissions projections for the lease sales, using a 20-year GWP.

IV.     **Human Health Impacts of Oil and Gas Production**

   A.  **General Background on Health Impacts of Oil and Gas Leasing and Production**

   128.    The reasonably foreseeable development of the 42 challenged lease parcels and approximately 120 APDs will result in large quantities of oil and natural gas production through a combination of horizontal and vertical wells and hydraulic fracturing ("fracking").

   129.    Together, the EAs for BLM's decisions to re-approve the leases estimate that development of all 42 parcels from all of the challenged lease sales will result in the production of 127,159,093 thousand cubic feet (mcf) of gas and 2,828,769 barrels (bbl) of oil. In the Ford EA for the challenged APDs, BLM estimates 1,759,817.67 mcf of gas and 615,515.65 bbl of oil *per well* over 20 years. Development of these leases and drilling permits will result in the disruption to community life, public health, and historic and cultural sites that accompany such significant quantities of oil and gas development, especially when coupled with all past, present, and reasonably foreseeable development near the leasing and drilling, in the San Juan Basin/Greater Chaco area, and in the state of New Mexico and Southwest region overall.

   130.    Oil and gas operations generate toxic air emissions and large quantities of toxic waste, threaten drinking water sources, and present a range of significant threats to public health and safety. The thousands of people who call the lease sale area home, and who work, worship, and recreate there, are exposed and will be exposed to more severe health and safety impacts from oil and gas activities in the area on a regular basis.

   131.    In each of the 2022 leasing EAs, and in the Ford EA for the challenged drilling permits, BLM lists some general categories of public health and safety-related risks that have resulted from oil and gas development in the San Juan Basin in the past, but does not mention specific incidents, nor does it *analyze* these risks or the reasonably foreseeable *effects* of

affirming its leasing decisions or authorizing drilling.

132.    In the 2022 leasing EAs, BLM cites to a Headwaters Economics report to describe additional socioeconomic factors that can exacerbate health and safety risks and effects, and identifies populations in the lease sale area that are generally subject to these increased risks and effects. However, BLM does not explain why these factors are not significant, or otherwise articulate a rational connection between these findings and its decision to issue a Finding of No Significant Impact and to re-approve the leases.

133.    BLM also states in the 2022 leasing EAs that specific health risk analyses cannot be performed until project-specific details are known. Yet the Ford EA, covering approximately 120 challenged APDs on the leases, was already completed in December of 2020—and it includes no such project-specific health risk or impact analysis.

134.    In the Ford EA for the challenged APDs, BLM does acknowledge that the closest residences are within 1 mile of the Proposed Project Area, but proceeds, without explanation, to dismiss health risks and impacts as insignificant.

135.    NEPA and its implementing regulations require BLM to do more than list-generalized categories of risks: the agency must analyze and take a hard look at those risks and their reasonably foreseeable *impacts*. While exposure risks are an important component of NEPA's requisite analysis, a hard look at health also requires analysis and disclosure of the health *outcomes* that may arise from those risks.

136.    Community Groups have raised concerns and cited studies about numerous potentially significant health outcomes —ranging from asthma and eye or skin irritation to birth defects and cancer— associated with oil and gas development, such as the reasonably foreseeable development of the leased parcels and approved APDs. Yet BLM fails to take a hard

look at such impacts as they relate to its leasing and permitting decisions in the 2022 leasing EAs or the Ford EA.

137.    The mere existence of other laws, regulations, and policies designed to protect public health and safety—such as OSHA worker safety laws, Department of Transportation traffic and pipeline safety laws, or spill response plans—does not adequately address or mitigate most of the aforementioned health effects. Nor does it eliminate BLM's obligation under NEPA to take a hard look at potentially significant health risks and impacts at the lease sale stage, before the irretrievable commitment of resources, rather than waiting until the APD stage, or worse, waiting until a spill or other incident occurs. Especially where, as here in the 2022 leasing EAs, BLM defers health risk analysis to the drilling stage, yet has already approved approximately 120 APDs on the leases under the Ford EA without conducting such an analysis.

138.    In its discussion of health impacts in the 2022 leasing EAs, BLM lists air pollutant emissions from future potential development on the nominated lease parcels as a small "percent increase" over emissions from the approximately 38,000 oil and gas wells already in the area. However, it is precisely these "incremental impacts," when combined with other past, present, and reasonably foreseeable future actions, that NEPA and its implementing regulations require BLM to analyze. 40 C.F.R. § 1508.7.

139.    Similarly, in the Ford EA, BLM cites a small "percent increase" in wells resulting from the APD approvals and states that "this incremental addition would in a small way sustain or increase risks to safety and health within the San Juan Basin" and that "ongoing and future development would continue to present cumulative risks to human health as detailed above" but that "when wells reach the end of their useful life and are properly plugged and reclaimed, they would no longer contribute to this effect."

140.    Yet, as BLM itself acknowledges in the 2022 leasing EAs, even short-term exposure to toxic air pollutants, including VOCs, ozone, and particulate matter, can have significant health impacts. For people living in oil and gas country, headaches, dizziness, vision and memory problems, irritation of the eyes, nose, throat, and lungs, and shortness of breath cannot be dismissed as a mere short-term nuisance. Consequently, many of these and other health effects can endure long after the acute exposure is gone.

141.    While BLM does acknowledge the potential for health effects to last beyond the life of a well in the 2022 leasing EAs, it fails to connect this fact to its decision-making or explain why it does not think these effects are potentially significant. Similarly, in the Ford EA for the APDs, BLM altogether ignores the fact that even short-term exposures can have lasting health effects.

142.    In the 2022 leasing EAs, BLM does acknowledge that "other economic or social indicators can also influence the general health risks of a population, such as poverty status, educational attainment, or language proficiency," and the agency identifies percentages of such populations generally thought to be at higher risk in Sandoval, Rio Arriba, McKinley, and San Juan counties. However, the agency again fails to connect this identification of populations at higher risk to its decision-making.

**B.  Air Pollution Impacts**

143.    Health effects related to air pollution are reasonably foreseeable and potentially significant, and thus must be included in BLM's NEPA analysis. Oil and gas drilling, hydraulic fracturing, production, transmission, and processing result in emissions of methane, nitrogen oxides ("NOx"), and VOCs that contribute to ozone formation, hazardous air pollutants, and airborne particulates.

**144.** Hazardous air pollutants associated with oil and gas production include benzene, toluene, ethylbenzene, and xylene. These hazardous air pollutants are linked to cancer, neurological, cardiovascular, liver, kidney, and respiratory effects as well as effects on the immune and reproductive systems.

**145.** Ozone is formed in the atmosphere and can move with the wind—causing health problems for entire regions—not just for people living close to oil and gas facilities. BLM acknowledges in the 2022 leasing EAs, and in the Ford EA for the APDs, that ozone is "a criteria pollutant that is of most concern" for the analysis areas.

**146.** High ozone levels are an increasing concern in oil and gas producing regions. Ozone exposure is linked to numerous adverse health conditions, including "respiratory, cardiovascular, and total mortality as well as decreased lung function, asthma exacerbation, COPD [chronic obstructive pulmonary disease], cardiovascular effects and adverse birth outcomes."

**147.** Ground-level ozone is linked to additional health effects, including: premature mortality for adults and infants; cardiovascular morbidity, such as heart attacks; and respiratory morbidity, such as asthma attacks and acute and chronic bronchitis. These impacts result in more hospital and emergency room visits, lost work and school days, and restricted activity days.

**148.** Ozone levels in the San Juan Basin are already close to the thresholds for exceeding the NAAQS, and San Juan County received a failing grade of "F" for ozone pollution from the American Lung Association in 2021. In the 2022 leasing EAs and the Ford EA, BLM acknowledges that ozone levels have come close to exceeding the NAAQs in San Juan County and states that "[I]f such exceedances were to occur, the area would be designated 'nonattainment,' which could impact industrial development for the area."

**149.**     Adverse health effects are well documented for both short and long-term exposure to particulate matter and other air pollutants from oil and gas operations.  Air pollution exposure can affect both short-term and long-term lung function, and exacerbate existing medical conditions, including asthma and heart disease. Even short-term exposure to particulate matter and ozone has been scientifically linked to increased hospital admissions, emergency room visits, and even deaths. EPA's 1-hour, 8-hour, and 24-hour standards for various National Ambient Air Quality Standards (NAAQSs) reflect this recognition of significant human health effects associated with even short-term exposure. There is no safe limit for Hazardous Air Pollutants (HAPs). BLM also overlooks local air monitoring data provided by Community Groups and in the Counselor HIA-KBHIS.

### C.  Cumulative Health Impacts and Social Determinants of Health

**150.**     The reasonably foreseeable oil and gas development arising from BLM's drilling permit approvals and re-approval of the lease sales involves multiple sources of pollutants and disturbance, including but not limited to the operations of wellpads, trucks, wells, compressors, pipelines, tanks, pits, separators, dehydrators, rigs, and more. BLM did not take a hard look at the cumulative impacts on human health from lease development and drilling, taking into consideration all past, present, or reasonably foreseeable future development in the Greater Chaco area.

**151.**     As part of public comments on the 2022 leasing EAs, Community Groups provided BLM with a Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking. The Compendium contains peer-reviewed scientific studies about the health effects of fracking and oil and gas development, including multiple sections that discuss cumulative effects, including references to cumulative health impacts. It also describes

cumulative impacts and "multiple consequences for public health and safety" arising from "unstable economic fundamentals of the industry as a whole."

152.     In assessing cumulative health impacts associated with its leasing and drilling permit decisions, BLM must analyze "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.  This includes underlying exposures and susceptibilities, whether they result from ongoing oil and gas development, topography and wind and weather patterns, or "social determinants of health."

153.     The U.S. Office of Disease Prevention and Health Promotion, a branch of the U.S. Department of Health and Human Services, defines social determinants of health as:

> conditions in the environments in which people are born, live, learn, work, play, worship, and age that affect a wide range of health, functioning, and quality-of-life outcomes and risks. Conditions (e.g., social, economic, and physical) in these various environments and settings (e.g., school, church, workplace, and neighborhood) have been referred to as 'place.' In addition to the more material attributes of 'place,' the patterns of social engagement and sense of security and well-being are also affected by where people live. Resources that enhance quality of life can have a significant influence on population health outcomes. Examples of these resources include safe and affordable housing, access to education, public safety, availability of healthy foods, local emergency/health services, and environments free of life-threatening toxins.

154.     Despite the importance of "place" and the "patterns of social engagement and sense of security and well-being" that can significantly affect health outcomes, BLM failed to take a hard look at these factors.  Where it did mention socioeconomic factors or other factors contributing to cumulative risks and impacts in the 2022 leasing EAs and the Ford EA, BLM failed to articulate why those factors were not significant and otherwise failed to articulate a rational connection between the facts found and the choices made to re-affirm the leases and to approve the challenged APDs.

//

V.     **Environmental Justice**

**155.**     Health impacts, "social determinants of health," and environmental justice are

inexorably linked. Indeed, the CEQ Guidance on Environmental Justice in the NEPA process

expressly emphasizes the importance of using public health data to identify "the potential for

multiple or cumulative exposure to human health or environmental hazards in the affected

population and historical patterns of exposure to environmental hazards…" Like the CEQ

Guidance, EO 12898 on environmental justice also states that "[e]nvironmental human health

analyses, whenever practicable and appropriate, shall identify multiple and cumulative

exposures."

**156.**     BLM acknowledges its obligation to analyze environmental justice in each of the

2022 leasing EAs, citing EO 12898, the CEQ Guidance, and its own handbook.  In the 2022

leasing EAs, BLM also explains how it identifies environmental justice "communities of

concern" and the geographic scope of its analysis.  In Appendices for the 2022 leasing EAs,

BLM includes a map to show the position of the lease parcels relative to surrounding

communities and Chapter Houses.

**157.**     In both the 2022 leasing EAs and the Ford EA, BLM fails to connect its findings

on environmental justice to its decision-making. In each of the 2022 leasing EAs and in the Ford

EA, BLM identifies EJ populations or communities of concern and the potential for

disproportionate and adverse risks or impacts to those populations, but fails to explain whether

and how those impacts will be mitigated or avoided and fails to explain why those impacts are

not significant.

**158.**     For example, in a 2022 leasing EA, BLM identifies ten "population centers" as

"communities of concern" with respect to environmental justice. BLM also acknowledges in the

EA that "most nominated lease parcels are within close proximity to residences."

159.    In the Ford EA, BLM's analysis of environmental justice is even more cursory—as is the analysis in the flawed, original December 2018 RPFO leasing analysis to which it tiers. BLM "concludes that there are low-income, minority, and Native American populations of concern (or 'Environmental Justice Populations'), defined under Executive Order 12898, that may be disproportionately and adversely impacted by activities resulting from the development of the Proposed Action," but largely fails to analyze or disclose what these disproportionate and adverse impacts are, explain why they are not significant, or otherwise articulate a rational connection between the facts found and the choices made to approve the APDs. While the agency does acknowledge in the Ford EA that "in general, socioeconomic impacts and environmental justice are of a cumulative nature," it again fails to analyze or disclose such impacts, or connect them to its decision-making.

## VI.    BLM's Failure to Take a Hard Look at Oil and Gas Impacts on Cultural Sites

160.    None of BLM's EAs for the 2022 leasing decisions or the challenged APDs include any landscape-level analysis of oil and gas development's indirect and cumulative impacts to significant cultural sites such as the Chaco Cultural National Historical Park ("the Park"), Chacoan Outliers, or other cultural components of the Greater Chaco Landscape.

161.    The Greater Chaco landscape has been described as the "Chaco Phenomenon" due to its unique archeological signatures. Congress recognized "the national significance of the Chacoan sites" and the need to protect these "unique archaeological resources" when it created the Park in 1980. 16 U.S.C. § 410ii.

162.    The legislation creating the Park also designated 33 separate "Chaco Cultural Archaeological Protection Sites" outside the Park boundaries for preservation and interpretation,

which are jointly managed by the National Park Service ("NPS"), BLM, BIA, and the Governor of New Mexico. 16 U.S.C. § 410ii-1(b). Of the 33 sites on the list, 13 of them are on BLM lands, which the agency characterizes as "outstanding examples of cultural resources from [the Pueblo II and Pueblo III] period[s]." These sites are all linked through a network of prehistoric roads, many of which are still present on the landscape and recognizable on aerial photographs.

163.     Air and light pollution, noise, and vehicle traffic from BLM-authorized oil and gas development all have the potential to indirectly and cumulatively impact cultural sites such as the Park, Chaco Protection Sites, traditional cultural sites, and other cultural manifestations of the Chaco Phenomenon.

164.     Despite the abundance of landscape-level cultural sites that may be adversely impacted by lease development, BLM has failed to analyze oil and gas development's indirect and cumulative impacts to these sites. Such a "landscape-level" analysis of impacts is required before BLM can reauthorize the leases or approve any APDs on the leases. Absent such an analysis, BLM has no support for a finding of no significant impact to cultural sites.

165.     In the 2022 leasing EAs, BLM does not provide an analysis of the indirect and cumulative impacts to cultural sites from lease development. BLM states that consultation pursuant to the National Historic Preservation Act ("NHPA") is "ongoing," and that further consultation will be conducted at the APD stage. However, archaeological surveys and consultation undertaken pursuant to the NHPA are not *per se* equivalent to taking a hard look at oil and gas development's indirect and cumulative impacts to cultural sites under NEPA. Moreover, BLM's Ford EA already approved approximately 120 APDs on the leases in a decision that *pre-dates* the 2022 leasing EAs.

166.     In the Ford EA for the APDs, BLM's assessment of cultural sites is limited to

discussing the results of archaeological surveys within the footprints of 13 well pads and their associated facilities. By focusing exclusively on direct impacts to archaeological sites within the APD footprint, BLM fails to appreciate the essential distinction between: (1) small archaeological sites for which direct impacts can be easily identified and mitigated at a site-specific level, and (2) off-site landscape-level cultural sites which can be indirectly and/or cumulatively impacted by APD development, and cannot be mitigated by avoidance or excavation.

167.    BLM did not analyze noise, air, and visual impacts from activities on the leases or well pads and their associated infrastructure to cultural sites located outside the project footprint. In the Ford EA, BLM limits its discussion of cumulative impacts to cultural sites to the amount of acreage where surface disturbance from development of future APDs on the leases will occur.

168.    The National Park Service has recognized that impacts diminishing the integrity of cultural sites are not limited to physical destruction of the property, but also include off-site audible and visual intrusions that can damage features of the property's setting that contribute to its historic significance. *See, e.g.*, 36 C.F.R. §§ 800.5(a)(2)(iv), (v). Thus, analysis of direct impacts to archaeological sites is neither the equivalent of, nor a substitute for, analysis of indirect and cumulative effects to landscape-level cultural sites.

169.    BLM implicitly acknowledges the controversy and the complexity of oil and gas development in the Settlement Agreement in *Dine CARE I*, where it agreed to hold additional public meetings and engage in additional cultural sites analysis.[13]  BLM made a similar tacit acknowledgement in the 2022 leasing EAs. Yet BLM has not made efforts to analyze off-site

---

[13] Settlement Agreement at ¶¶ 7, 8

indirect or cumulative impacts to cultural sites either in the Ford EA or in the additional analyses supporting its decisions to re-affirm the leases.

### VII.    BLM's Failure to Comply With FLPMA: Unnecessary or Undue Degradation

170.   FLPMA provides Interior with the authority and responsibility to serve as *both* the trustee of federal public lands for the benefit of the American people *and* the regulator of federal public lands uses. FLPMA requires Interior to:

- Protect public land values including air and atmospheric, water resource, ecological, environmental, and scenic values, and to preserve and protect "certain public lands in their natural condition," and "food and habitat for fish and wildlife";

- Account for "the long-term needs of future generations";

- Prevent "permanent impairment of the productivity of the land and quality of the environment"; and

- "[T]ake any action necessary to prevent unnecessary or undue degradation of the lands."

171.   These substantive obligations have existed since the passage of FLPMA in 1976.

172.   However, Interior has never defined how the multiple use mandates apply to land and resource management planning generally, or to the federal onshore oil and gas program specifically.

173.   Moreover, BLM has never defined what constitutes "unnecessary or undue degradation," therefore preventing BLM from applying FLPMA's substantive mandate to take action necessary to prevent unnecessary or undue degradation when authorizing the challenged oil and gas leases and drilling permits, or when considering the broader cumulative climate impacts that the oil and gas program causes on public lands.

174.   While Interior has discretion in how it implements these duties, that discretion is not unlimited and FLPMA's mandates cannot be ignored. This is particularly true where, as

here, the agency acknowledges that its re-approval of the challenged leases and approval of the challenged drilling permits on federal public lands will result in substantial greenhouse gas emissions, that such emissions are a fundamental cause of the climate crisis, and that the climate crisis results in ongoing and escalating impacts to public lands. Yet the agency has failed to take action to prevent unnecessary and undue degradation to public lands—as is its substantive obligation.

175. As BLM admits in its Specialist Report, and in reliance on IPCC and the National Climate Assessment scientific consensus, "[c]urrent ongoing global climate change is caused, in large part, by the atmospheric buildup of GHGs," which include $CO_2$, $CH_4$, $N_2O$, and fluorinated gases. Quoting the IPCC's climate assessment report, BLM offers: "Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, sea level has risen, and the concentration of greenhouse gases have increased."

176. BLM also recognizes that the National Climate Assessment provides region-specific impact assessments for climate change, that each region has experienced increasing temperatures, and that the largest changes were in the western have of the United States. For example, in New Mexico, since 1980 the mean annual temperature increased by approximately 2.5° F, and that drought is currently more severe than any in recent historical record. These effects are already occurring.

177. BLM also predicts future climate impacts at a state-level based on various emission scenarios. For example, in New Mexico temperatures could increase by as much as 12° F above current levels by the end of the century. Precipitation is projected to decrease, with

negative impacts on snowpack. There would be decreases in overall water availability by one-quarter to one-third, with increased frequency and intensity of both droughts and floods. This will also increase the risk of wildfires, which are projected to become more frequent and severe.

178.    "Global fossil $CO_2$ emissions were estimated at 38,000 Mt [million tons] for 2019" with increased in $CO_2$ emissions being attributable to fossil fuel use in industrial processes and combustion. The agency further acknowledges the "general consensus among climate scientists that to limit global temperature rise to 1.5° C and avoid serious climate changes, global emissions must drop to 25,000 Mt by 2030." The United States is responsible for over 13% of current global emissions, while "emissions from oil in the U.S. increased in recent years due primarily to the increase from new production in basins such as the Permian," and "emissions from natural gas have increased dramatically both globally, and in the U.S., due to increases in production and demand."

179.    BLM also acknowledges that global energy related $CO_2$ emissions are projected to increase through 2050 from about 35 billion metric tons of $CO_2$ to about 43 billion metric tons, and that 82% of total U.S. emissions are due to energy production and use from fossil fuels.

180.    The agency has nonetheless refused to apply such admissions to its substantive duty to take action to prevent the unnecessary and undue degradation of public lands, either generally or as applied to its authorization of the oil and gas leases and drilling permits challenged here.

//

## CLAIMS FOR RELIEF

### First Claim for Relief

**Failure to Take a Hard Look at Cumulative Greenhouse Gas Emissions and
Cumulative Climate Change Impacts
(Violation of NEPA)**

**181.**     Community Groups incorporate by reference all preceding paragraphs.

**182.**     Pursuant to NEPA and NEPA's implementing regulations, BLM must take a hard

look at the direct, indirect, and cumulative environmental consequences of a proposed action. 42

U.S.C. § § 4332 (C)(i)-(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7, 1508.8, and 1508.14.

**183.**     BLM is required to take a hard look at these impacts at the leasing stage, *before*

there are "any irreversible and irretrievable commitments of resources which would be involved

in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R.

§§ 1501.2, 1502.5(a).

**184.**     To comply with NEPA, BLM was required to take a hard look at cumulative

GHG emissions, including the context and severity of the *impacts* of those emissions on climate

change and otherwise, for its re-approval of the December 2018, November 2019, and February

2020 leases and for its approval of the challenged APDs.

**185.**     Federal Defendants failed to take a hard look at cumulative GHG emissions and

cumulative climate impacts, and failed to discuss the severity of those impacts, in re-approving

the RPFO December 2018, RPFO November 2019, and RPFO and FFO February 2020 lease

sales, and in approving the challenged APDs. More broadly, Federal Defendants have failed to

assess the cumulative impacts of the agency's leasing activities across the Greater Chaco region

and have demonstrated a systemic failure to account for the cumulative climate impacts of

BLM's Oil and Gas Leasing Program affecting federal lands across the western U.S. Federal

Defendants' systemic and decision-specific failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA, 42 U.S.C.§ 4332(C)(ii), and its implementing regulations at 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, 1508.27, and the APA at 5 U.S.C. § 706(2)(A).

## Second Claim for Relief

**Failure to Take a Hard Look at Direct and Cumulative Health Impacts
(Violation of NEPA)**

186.    Community Groups incorporate by reference all preceding paragraphs.

187.    NEPA and its implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety." 40 C.F.R. § 1508.27 (b).

188.    NEPA also states it as national policy that federal agencies "shall use all practicable means, consistent with other essential considerations of national policy," to improve federal plans in order to, inter alia, "assure for all Americans safe, healthful…surroundings [and] attain the widest range of beneficial uses of the environment without…risk to health or safety." 42 U.S.C. § 4331(b).

189.    Here, for its re-approval of the December 2018, November 2019, and February 2020 lease sales, and for its approval of the challenged APDs, BLM failed to satisfy NEPA and its implementing regulations by: (1) failing to take a hard look at the direct and cumulative impacts of oil and gas operations on human health; (2) failing to evaluate and apply recent and relevant scientific and health data; and (3) failing to take a hard look at reasonably foreseeable, potentially significant human health risks and impacts, in particular cumulative health risks and impacts, as they relate to environmental justice.

190.    BLM, charged with evaluating reasonably foreseeable, potentially significant adverse effects on the human environment, dismissed the few health and safety risks it analyzed

as temporary. However, substantial relevant information on health impacts was available to BLM, and BLM was required to develop all additional health impact information that was essential to a reasoned choice among alternatives.

191.    BLM also violated 40 C.F.R. §1503.4 by not responding adequately to Community Groups' comments and the health studies and other information provided therewith on health impacts, and not explaining why it has failed to undertake the requested Health Impact Assessment ("HIA") or consider the Counselor HIA-KBHIS.

192.    BLM failed to take a hard look at human health impacts of expanded oil and gas leasing and development, including cumulative impacts related to environmental justice and social determinants of health, when re-approving the RPFO December 2018, RPFO November 2019, and RPFO and FFO February 2020 lease sales, and when approving the challenged APDs through the Ford EA. BLM's failure to examine relevant human health data and articulate a satisfactory explanation for its actions, or make a rational connection between the facts found and choices made, was arbitrary, capricious, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii) and its implementing regulations, 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, and 1508.27, and the APA at 5 U.S.C. § 706(2)(A).

### Third Claim for Relief

**Failure to Take a Hard Look at Environmental Justice**
**(Violation of NEPA)**

193.    Community Groups incorporate by reference all preceding paragraphs.

194.    BLM failed to consider the effects of its leasing and permitting decisions, not only *on* environmental justice "populations", but also in the *context* of underlying environmental justice issues and how those might amplify or exacerbate reasonably foreseeable health and

socioeconomic risks and effects resulting from its re-approval of the lease sales and its approval of the challenged drilling permits.

195.    Environmental Justice is a relevant factor at which courts have held federal agencies must take a hard look under NEPA. *See* Council on Envt'l Quality, Environmental Justice: Guidance Under the National Environmental Policy Act (December 10, 1997), at 8 ("[e]nvironmental justice issues may arise at any step of the NEPA process and agencies should consider these issues at each and every step of the process, as appropriate"). BLM's identification of "environmental justice" populations or communities and list of potentially adverse and disproportionate effects of the lease sales and drilling permit approvals on these populations and communities, without analyzing these effects further or connecting this acknowledgment of environmental justice to its decision-making, failed to satisfy its hard look obligation and its obligation to articulate a rational connection between the facts found and the choices made.

196.    BLM's failure to take a hard look at impacts to environmental justice or articulate a satisfactory explanation for its actions, including a rational connection between the facts found and choices made, was arbitrary, capricious, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii) and its implementing regulations, 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, and 1508.27, and the APA at 5 U.S.C. § 706(2)(A).

## Fourth Claim for Relief

### Failure to Take a Hard Look at Indirect and Cumulative Impacts to Cultural Sites (Violation of NEPA)

197.    Community Groups incorporate by reference all preceding paragraphs.

198.    NEPA and its implementing regulations direct agencies to consider "unique characteristics of the geographic area such as proximity to historic and cultural resources . . ."

40 C.F.R. § 1508.27 (b)(3).

**199.**    All of Federal Defendants' leasing re-approvals and drilling permit approvals challenged herein have the potential to adversely impact landscape-level cultural sites such as Chaco Cultural National Historical Park, affiliated Chaco Great House sites, and ancient ceremonial roads.

**200.**    BLM's failure to consider the indirect and cumulative effects of its leasing and permitting decisions on landscape-level cultural sites violated NEPA and its implementing regulations and was arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A).

### Fifth Claim for Relief

**Failure to Prevent Unnecessary or Undue Degradation of Public Lands
(Violation of FLPMA)**

**201.**    Community Groups incorporate by reference all preceding paragraphs and Appendices below.

**202.**    The Secretary of the Interior is required to "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

**203.**    BLM acknowledges multiple negative environmental impacts of the challenged oil and gas leasing and drilling permit authorizations, including millions of metric tons of GHG emissions per year. The agency also acknowledges current climate science and the scientific consensus that BLM-managed greenhouse gas emissions contribute to anthropogenic climate change, that climate-induced impacts are already occurring, and that these impacts will increase and become more severe over time without dramatic emissions reductions and the implementation of aggressive mitigation pathways.

204.   However, BLM has neither defined what constitutes "unnecessary or undue degradation" in the management of oil and gas resources and the leasing decisions and drilling permits challenged here—with particular consideration of greenhouse gas emissions and resulting climate impacts, and landscape-level impacts to the Greater Chaco and the sacred Sisnaateel Mesa Complex, nor has the agency adequately explained why its re-approval of nearly 45,000 acres of leases, and approval of approximately 120 additional drilling permits on those leases, will not result in such degradation, as required by FLPMA, 43 U.S.C. § 1732(b).

205.   BLM's failure to take action necessary to prevent unnecessary or undue degradation in the context of climate impacts, the profound importance of the Greater Chaco landscape and its people and communities, and the history and ongoing treatment of the Greater Chaco as a sacrifice zone, is arbitrary and capricious agency action, an abuse of discretion, and action without observance of procedures required by law, pursuant to the APA. 5 U.S.C. § 706(2).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that Federal Defendants' leasing and permitting decisions violated NEPA and its implementing regulations, and FLPMA and its implementing regulations;

B.     Vacate, set aside, and remand Federal Defendants' leasing and permitting decisions;

C.     Enjoin Federal Defendants from any further leasing and APD authorizations or re-authorizations within the lease sale area pending Federal Defendants' full compliance with NEPA and its implementing regulations, and FLPMA and its implementing regulations.

D.     Retain continuing jurisdiction of this matter until Federal Defendants fully

remedy the violations of law complained of herein;

      **E.**    Award the Community Groups their fees, costs, and other expenses as provided

by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

      **F.**    Grant Community Groups such additional and further relief as this Court may

deem just, proper, and equitable.

      Respectfully submitted this 26th day of October, 2022.

WESTERN ENVIRONMENTAL LAW CENTER

/s/ *Allyson A. Beasley*
Allyson A. Beasley
beasley@westernlaw.org
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571
(p) 575.224.6260

/s/ *Kyle J. Tisdel*
Kyle J. Tisdel
tisdel@westernlaw.org
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571
(p) 575.613.8050

/s/ *Rose E. Rushing*
Rose E. Rushing
rushing@westernlaw.org
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571
(p) 505.278.9577

*Counsel for Plaintiffs*

WILDEARTH GUARDIANS

*/s/ Samantha Ruscavage-Barz*
Samantha Ruscavage-Barz
sruscavagebarz@wildearthguardians.org
301 N. Guadalupe Street, Suite 201
Santa Fe, New Mexico 87501
(p) 505.401.4180

*Counsel for Plaintiff WildEarth Guardians*

BAAKE LAW, LLC

*/s/ David R. Baake*
David R. Baake
david@baakelaw.com
350 El Molino Blvd
Las Cruces, NM 88005
(p) 575.343.2782

*Counsel for Plaintiff Sierra Club*